ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :    INDICTMENT

              - v. -             :    23 Cr.

AVRAHAM EISENBERG,               :    **23 CRIM 010**

              Defendant.         :

- - - - - - - - - - - - - - - x

**COUNT ONE**
(Commodities Fraud)

The Grand Jury charges:

Overview

1. In or about October 2022, AVRAHAM EISENBERG, the defendant, orchestrated and carried out a scheme to fraudulently obtain approximately $110 million worth of cryptocurrency from a cryptocurrency exchange called Mango Markets and its investors.

2. At all relevant times, Mango Markets allowed investors to buy and sell perpetual futures contracts ("Perpetuals"). That included Perpetuals based on the relative value of Mango Markets' native crypto token, MNGO, and a crypto stablecoin called USDC ("MNGO Perpetuals"). An investor who buys MNGO Perpetuals stands to profit if the value of MNGO rises relative to the value of USDC, while an investor who sells MNGO Perpetuals stands to profit if the value of MNGO falls relative to USDC.

3. On or about October 11, 2022, AVRAHAM EISENBERG, the defendant, deceptively used two accounts on Mango Markets that did not appear to the public to both be controlled by him, but were in fact controlled by him, to sell himself, from himself, a large number of MNGO Perpetuals. EISENBERG then made a series of large purchases of MNGO using USDC, with the objective of artificially increasing the price of MNGO relative to USDC and, in turn, the price of MNGO Perpetuals on Mango Markets. That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to rise approximately 1300 percent.

4. As the price of MNGO Perpetuals on Mango Markets rose due to the manipulative purchasing by AVRAHAM EISENBERG, the defendant, the apparent value of the MNGO Perpetuals that EISENBERG had purchased from himself also rose. Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the artificial increase in the value of the MNGO Perpetuals EISENBERG had purchased from himself allowed him to borrow, and then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange.

5. When AVRAHAM EISENBERG, the defendant, borrowed and withdrew that cryptocurrency, he had no intention of repaying the

borrowed funds but rather to steal those funds.

### Background on Mango Markets

6. At all times relevant to this Indictment, Mango Markets was a decentralized cryptocurrency exchange that allowed investors to, among other things, purchase and borrow cryptocurrencies and cryptocurrency-related financial products. Mango Markets was run by the Mango Decentralized Autonomous Organization (the "Mango DAO").

7. The Mango DAO had its own crypto token, called MNGO, which investors could buy and sell. Holders of MNGO were allowed to vote on changes to Mango Markets and issues related to the governance of the Mango DAO, among other things.

8. To use Mango Markets, an investor had to connect a cryptocurrency wallet to the exchange, create a Mango Markets account, and deposit cryptocurrency into that account. Once an investor created and funded a Mango Markets account, the investor could trade different types of cryptocurrencies, including MNGO, on the Mango Markets exchange.

9. One type of trade investors could make is a "spot" trade. In a spot trade, an investor exchanges one cryptocurrency for another, at whatever the prevailing exchange rate between those two cryptocurrencies is at the time of the transaction.

10. Another type of trade investors on Mango Markets

could make was a perpetual futures contract, or "Perpetual" for short. When an investor buys or sells a Perpetual for a particular cryptocurrency, the investor is not buying or selling that cryptocurrency. Instead, the investor is buying or selling exposure to future movements in the value of that cryptocurrency relative to another cryptocurrency. For example, an investor who buys a Perpetual based on the relative value of USDC and MNGO (a "MNGO Perpetual," for short) at a price of 0.02 USDC/MNGO is "long" on MNGO, and the value of that position will rise if the value of MNGO rise above 0.02 USDC/MNGO. Conversely, the investor who sold that Perpetual is "short" on MNGO, and the value of that position will rise if the value of MNGO falls relative to USDC. Either party to a Perpetual can settle the Perpetual at any time and realize their gain or loss.

11. To determine the settlement price of Perpetuals, Mango Markets uses an "oracle," which is a computer program that calculates the relative value of two cryptocurrencies by looking at the exchange rate of those cryptocurrencies on various cryptocurrency exchanges (the "Oracle"). When the Oracle price changes for a particular cryptocurrency pairing, the settlement price of Perpetuals based on that cryptocurrency pairing also changes on Mango Markets.

12. Each party to a Perpetual on Mango Markets also

regularly makes or receives payments known as "funding" payments. Funding payments are calculated based on the midprice of bids and asks for that Perpetual compared to the Oracle price for that Perpetual. Funding payments are designed to ensure the purchase price for Perpetuals stays close to settlement prices.

13. In addition to buying and selling cryptocurrencies and Perpetuals, Mango Markets also allowed investors to use their deposits and positions as collateral for borrowing and withdrawing cryptocurrency from the Mango Markets exchange. To borrow through Mango Markets, an investor had to access the Mango Markets website and click a button labeled "borrow" that allowed the investor to borrow cryptocurrency. The investor could then withdraw the borrowed cryptocurrency by clicking another button labeled "withdraw." The borrowed cryptocurrency came from cryptocurrency that other investors had deposited in Mango Markets accounts.

14. The amount that an investor on Mango Markets could withdraw was determined by a formula that looks at, among other things, the value of the cryptocurrency deposited in the investor's account, the value of the investor's positions on Mango Markets, and the amount of cryptocurrency that the investor had already borrowed through Mango Markets. Mango Markets used a formula to track the relationship between these assets and liabilities, which Mango Markets labeled the "health" of the account. If the "health"

of a Mango Markets account fell below a certain threshold, the investor's positions on Mango Markets could be liquidated.

AVRHAM EISENBERG's Market Manipulation Scheme

15. On or about October 11, 2022, AVRAHAM EISENBERG, the defendant, transferred millions of USDC to two accounts on Mango Markets. Specifically:

  a. EISENBERG had a cryptocurrency account with a company called Circle ("Circle Account-1").

  b. On or about October 11, 2022, in the late morning and early afternoon, EISENBERG sent approximately 14,179,322 USDC from Circle Account-1 to a cryptocurrency wallet that then sent approximately 12,499,900 USDC to another account at a cryptocurrency exchange (the "Exchange-1 Account" and "Exchange-1," respectively). EISENBERG controlled the Exchange-1 Account, but it was registered in the name of a different person with a foreign address.

  c. Between approximately 3:36 p.m. and 3:50 p.m.[1], EISENBERG used the Exchange-1 Account to send approximately 5,524,838 USDC to a cryptocurrency wallet ("Solana Wallet-1") on the blockchain known as Solana, which is the blockchain on which Mango Markets is built.

  d. At approximately 3:47 p.m., EISENBERG used the

---

[1] All times in this Indictment are in Eastern Standard Time.

Exchange-1 Account to send approximately 4,999,999.95 USDC to another wallet on the Solana blockchain ("Solana Wallet-2").

   e. Between approximately 6:08 p.m. and 6:18 p.m., Solana Wallet-1 sent approximately 5,000,100 USDC to a Mango Markets account ("Mango Account-1").

   f. Between approximately 6:07 p.m. and 6:18 p.m., Solana Wallet-2 sent approximately 4,999,998.95 USDC to a different Mango Markets account ("Mango Account-2").

  16. AVRAHAM EISENBERG, the defendant, used Mango Account-2 to sell MNGO Perpetuals to Mango Account-1. The Perpetuals were based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO. Accordingly, Mango Account-1 held a "long" position, the value of which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO (the "Long MNGO Perpetual Position"). Mango Account-2 held a "short" position, the value of which would rise if the value of MNGO relative to USDC fell below 0.0382 USDC/MNGO (the "Short MNGO Perpetual Position"). EISENBERG, however, was the owner of both positions.

  17. Immediately after the creation of the Long and Short MNGO Perpetual Positions, AVRAHAM EISENBERG, the defendant, used USDC and another stablecoin called USDT to purchase large amounts of MNGO on multiple cryptocurrency exchanges with the objective of artificially increasing the value of MNGO relative to

USDC on the exchange on which EISENBERG traded. EISENBERG's purchases had their intended effect and caused the value of MNGO to increase relative to USDC. Specifically:

   a. Exchange-1 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

   b. Between approximately 6:26 p.m. and 6:40 p.m., EISENBERG used the Exchange-1 Account – which, as explained above, was registered to a different person – to sell USDC for a total of over 16 million MNGO. During that period, the price of MNGO on Exchange-1 rose from a low of approximately 0.0388 USDC/MNGO to a high of approximately 0.1557 USDC/MNGO.

   c. Aggregator-1 is a program that allows users to buy and sell cryptocurrency across a number of different cryptocurrency exchanges simultaneously. Aggregator-1 is available through the Mango Markets, as another way for Mango Markets investors to buy and sell cryptocurrency. One of the cryptocurrency exchanges through which Aggregator-1 transacts is one of the programs from which the Oracle gathered data for pricing Perpetuals.

   d. Between approximately 6:26 p.m. and approximately 6:45 p.m., on or about October 11, 2022, EISENBERG executed multiple transactions on Aggregator-1, in which he sold USDC for a total of over 3.4 million MNGO. At the same time as

8

EISENBERG made those purchases, the value of MNGO relative to USDC rose from a low of approximately 0.0389 USDC/MNGO to a high of approximately 0.91 USDC/MNGO on the exchange utilized by the Oracle for pricing Perpetuals.

  e. A cryptocurrency exchange with offices in New York, New York ("Exchange-2"), is another one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

  f. On or about October 11, 2022, EISENBERG opened and funded an anonymous account on Exchange-2 (the "Exchange-2 Account"), providing false information about his location to circumvent Exchange-2's restrictions on traders from the United States. Opening, funding, and trading through Exchange Account-2 resulted in wires and data being transmitted to, among other locations, Exchange-2's office in Manhattan.

  g. Between approximately 6:26 p.m. and approximately 6:45 p.m., EISENBERG used the Exchange-2 Account to sell USDT for over 1 million MNGO. During that period, the price of MNGO on Exchange-2 rose from a low of approximately 0.04 USDT/MNGO to a high of approximately 0.45 USDT/MNGO.

  18. By artificially manipulating the value of MNGO relative to USDC, AVRAHAM EISENBERG, the defendant, also intended to and did artificially increase the price of MNGO Perpetuals on Mango Markets. Specifically, between approximately 6:26 p.m. and

6:45 p.m., on or about October 11, 2022, the price of MNGO Perpetuals on Mango Markets rose from approximately 0.0382 USDC/MNGO to a high of approximately 0.54 USDC/MNGO — an increase of over 1300 percent.

19. As the price of those Perpetuals rose as a result of the above-described manipulative trading by AVRAHAM EISENBERG, the defendant, the apparent value of the Long MNGO Perpetual Position that Mango Account-1 had purchased rose, accordingly. Because of that increase in apparent value, EISENBERG, who controlled Mango Account-1, was able to use the "borrow" and "withdraw" function on Mango Markets to borrow and withdraw a large amount of cryptocurrency, without the "health" of Mango Account-1 dropping low enough to trigger liquidation.

20. Following that increase in borrowing power, AVRAHAM EISENBERG, the defendant, borrowed and withdrew approximately $110 million worth of different cryptocurrencies from Mango Markets. The cryptocurrency that EISENBERG borrowed and withdrew came from, among other places, the deposits and assets belonging to other Mango Markets investors. As a result of these actions, EISENBERG withdrew nearly all then-available funds from Mango Markets.

21. While AVRAHAM EISENBERG, the defendant, purported to be borrowing the cryptocurrency, he had no intention of repaying.

22. After AVRAHAM EISENBERG, the defendant, stopped purchasing MNGO with USDC, the price of MNGO Perpetuals on Mango Markets – which was no longer being artificially propped up by EISENBERG – collapsed to approximately 0.02 USDC/MNGO. As a result, the Long MNGO Perpetual Position dropped to having a negative value and the "health" of Mango Account-1 fell below zero, making Mango Account-1 subject to liquidation. There was, however, nothing to liquidate because EISENBERG had already withdrawn the cryptocurrency and the Long MNGO Perpetual had been revealed to be worthless.

Statutory Allegations

23. In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact and omitting to state a material fact

necessary in order to make the statements made not untrue or misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, EISENBERG engaged in a manipulative and deceptive scheme involving the intentional and artificial manipulation of the relative value of USDC and MNGO and the price of perpetual futures contracts on Mango Markets; trading with himself to create artificial perpetual futures contracts positions on Mango Markets; misrepresenting his intentions to borrow cryptocurrency from Mango Markets; and using false personal identifying and location information in furtherance of his scheme.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## Count Two
(Commodities Manipulation)

The Grand further Jury charges:

24. The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

25. In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, did knowingly and intentionally manipulated and attempted to manipulate the price of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered

entity, and of a swap, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on Mango Markets.

(Title 7, United States Code, Section 13(a)(2); Title 18, United States Code, Section 2.)

### Count Three
(Wire Fraud)

The Grand further Jury charges:

26. The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

27. In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, EISENBERG engaged in a manipulative and deceptive scheme involving the intentional and artificial manipulation of the relative value of USDC and MNGO and the price of perpetual futures contracts on Mango Markets; trading with himself to create artificial perpetual futures contracts

positions on Mango Markets; misrepresenting his intentions to borrow cryptocurrency from Mango Markets; and using false personal identifying and location information in furtherance of his scheme, and sent and caused to be sent wires in furtherance of the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

**FORFEITURE ALLEGATIONS**

28. As a result of committing the offense alleged in Count Three of this Indictment, AVRAHAM EISENBERG, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

SUBSTITUTE ASSET PROVISION

29. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

  (Title 18, United States Code, Sections 981 and 982;
   Title 21, United States Code, Section 853; and
   Title 28, United States Code, Section 2461.)

_____
Foreperson
1/9/23

_____
DAMIAN WILLIAMS
United States Attorney

15

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v. -

**AVRAHAM EISENBERG,**

Defendant.

### INDICTMENT

23 Cr.

(7 U.S.C. §§ 9(1), 13(a)(2), 13(a)(5); 17 C.F.R. § 180.1; 18 U.S.C. §§ 1343 and 2.)

DAMIAN WILLIAMS
United States Attorney.

1-9-2023
TRVE BILL & INDICTMENT
MJ. RWL
Wheel to DJ - BERMAN