# United States District Court
## District of Puerto Rico (San Juan)
## CRIMINAL DOCKET FOR CASE #: <u>3:22−mj−01583−BJM</u>−1

Case title: USA v. Eisenberg                     Date Filed: 12/27/2022

Assigned to: US Magistrate Judge
Bruce J. McGiverin

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **Avraham Mayer Eisenberg** | represented by | **Joseph A. Niskar** |
| | | Federal Public Defender's Office |
| | | Patio Gallery Building |
| | | 241 Franklin D. Roosevelt Ave. |
| | | Hato Rey, PR 00918−2441 |
| | | 787−281−4922 |
| | | Fax: 787−281−4899 |
| | | Email: <u>joseph_niskar@fd.org</u> |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Federal Public Defender* |
| | | |
| | | **Manuel San−Juan−DeMartino** |
| | | Manuel San Juan Law Office |
| | | PO Box 9023587 |
| | | San Juan, PR 00902−3587 |
| | | 787−723−6669 |
| | | Fax: 787−725−2932 |
| | | Email: <u>sanjuanm@microjuris.com</u> |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

**<u>Highest Offense Level</u>**
**<u>(Opening)</u>**
None

| **<u>Terminated Counts</u>** | **<u>Disposition</u>** |
|---|---|
| None | |

**<u>Highest Offense Level</u>**
**<u>(Terminated)</u>**

None

**Complaints**                                    **Disposition**

7:9(1) and 13(a)(5), 17:180.1,
18:2 Commodities Fraud;
7:13(a)(2), 18:2 Commodities
Manipulation

---

**Interested Party**

**US Probation Office**

---

**Plaintiff**

**USA**                          represented by   **Carlos Jose Romo−Aledo**
                                                  DOJ−USAO
                                                  Torre Chardon
                                                  350 Carlos Chardon Street
                                                  Suite 1201
                                                  San Juan, PR 00918
                                                  787−766−5656
                                                  Email: carlos.romo.aledo@usdoj.gov
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: AUSA Designation*

| Date Filed | # | Select<br>all / clear | Docket Text |
|---|---|---|---|
| 12/27/2022 | 1 | Rule 5 Documents Received as to Avraham Mayer Eisenberg (1). (Attachments: # 1 Arrest Warrant) (bgl) (Entered: 12/28/2022) | |
| | | *Main Document* | |
| | | Attachment # 1 *Arrest Warrant* | |
| 12/27/2022 | | Arrest of Avraham Mayer Eisenberg (1). (bgl) (Entered: 12/28/2022) | |
| 12/27/2022 | 3 | Minute Entry for proceedings held before US Magistrate Judge Bruce J. McGiverin: Initial Appearance in Rule 5(c)(3) Proceedings as to Avraham Mayer Eisenberg (1) held on 12/27/2022 via VTC. Present: AUSA Carlos Romo, AFPD Kevin Lerman and AUSPO Gabriela Hernandez. The defendant was present, under custody and did not require the assistance of a court interpreter. The defendant waived his right to appear physically at the hearing and consented to proceed by way of VTC. Defendant was advised as to the charges contained in the complaint from the Southern District of New York. The defendant was also advised of the applicable minimum and maximum statutory penalties that he is exposed to if convicted of the charges in the complaint. The defendant informed that he will be retaining counsel and requested court appointed counsel only for purposes of the initial appearance. The Court appointed the FPD's Office to represent the defendant | |

| | | |
|---|---|---|
| | | during the present hearing. As to detention, defense counsel offered arguments in favor of setting conditions of release today. Government argued in favor of temporary detention on the basis of risk of flight. After hearing the parties, the Court denied without prejudice the defendant's motion for release today. **A Identity, Removal and Detention Hearing is set for 12/30/2022 at 10:30 AM in Courtroom 9 before US Magistrate Judge Bruce J. McGiverin. Preliminary Examination is set for 1/10/2023 at 10:00 AM in Courtroom 9 before US Magistrate Judge Bruce J. McGiverin.** Government informed that a motion to unseal will be filed before the prosecuting district. (Court Reporter Zoom.) Hearing held at 12:05. Hearing ended at 12:22. (bgl) Modified on 12/28/2022 to edit docket text and modified hearing time as per CDC's request. (mg). Modified on 1/9/2023 to modify wording as to hearing. (mg). (Entered: 12/28/2022) |
| 12/27/2022 | 4 | ORDER scheduling detention hearing as to Avraham Mayer Eisenberg (1). Defendant is TEMPORARILY DETAINED pending hearing.  Signed by US Magistrate Judge Bruce J. McGiverin on 12/27/2022. (bgl) (Entered: 12/28/2022) |
| 12/28/2022 | 2 | NOTICE OF ATTORNEY APPEARANCE: Joseph A. Niskar appearing for Avraham Mayer Eisenberg (1) (Niskar, Joseph) (Entered: 12/28/2022) |
| 12/29/2022 | 5 | NOTICE OF ATTORNEY APPEARANCE: Manuel San−Juan−DeMartino appearing for Avraham Mayer Eisenberg (1) (San−Juan−DeMartino, Manuel) (Entered: 12/29/2022) |
| 12/29/2022 | 6 | ***SELECTED PARTIES***Notice of Disclosure of Pretrial Services Report as to Avraham Mayer Eisenberg (1). Pretrial Services Reports are made available to Defense Counsel and the Government. The Pretrial Reports are not public record, are not to be produced or disclosed to any other party, and shall remain confidential as provided in Title 18 U.S.C. 3153(c)(1), by USA, US Probation Office, Avraham Mayer Eisenberg (Hernandez−Ramirez, Gabriela) (Entered: 12/29/2022) |
| 12/30/2022 | 7 | Minute Entry for proceedings held before US Magistrate Judge Bruce J. McGiverin: Identity, Removal and Detention. Hearing as to Avraham Mayer Eisenberg (1) held on 12/30/2022. Present in court were AUSA Myriam Fernandez, Atty. Manuel San−Juan−DeMartino and AUSPO Gabriela Hernandez. The defendant was present, under custody and did not require the assistance of a court interpreter. Counsel informed that the defendant waives the identity and removal hearings, but requests for the detention hearing to be held in this district. Defendant was advised of his rights and was ordered removed to the Southern District of New York. As to detention, defense counsel argued in favor of setting conditions of release, proffering a potential third−party custodian and a secured property bond. Government moved in favor of detention on the basis of both grounds. After hearing the arguments of the parties, the Court held the matter under advisement. (Court Reporter DCR/ Courtroom 9.) Hearing set for 10:30. Hearing held at 11:06. Hearing ended at 11:30. (bgl) Modified on 1/9/2023 to add wording as to CRD's request. (mg). (Entered: 01/03/2023) |
| 01/04/2023 | 8 | ORDER OF DETENTION PENDING TRIAL as to Avraham Mayer Eisenberg (1). The order is without prejudice to any revision by the court in the prosecuting district.  Signed by US Magistrate Judge Bruce J. McGiverin |

| | | |
|---|---|---|
| | | on 1/4/2023. (JM) (Entered: 01/04/2023) |
| 01/05/2023 | <u>9</u> | TRANSCRIPT REQUEST *(Bail Hearing)* by Avraham Mayer Eisenberg (1) for proceedings held on 12−30−2022 before Judge Bruce J. McGiverin. (San−Juan−DeMartino, Manuel) (Entered: 01/05/2023) |
| 01/09/2023 | <u>10</u> | Rule 5 Documents Received (Southern District of New York Indictment) as to Avraham Mayer Eisenberg (1). (bgl) (Entered: 01/09/2023) |
| 01/09/2023 | 11 | ORDER as to Avraham Mayer Eisenberg (1) re <u>10</u> Rule 5 Documents Received:  **Preliminary Examination set for 1/10/2023 is vacated.** Signed by US Magistrate Judge Bruce J. McGiverin on 1/9/2023. (bgl) (Entered: 01/09/2023) |
| 01/09/2023 | <u>12</u> | COMMITMENT TO ANOTHER DISTRICT as to Avraham Mayer Eisenberg (1). Defendant committed to District of Southern District of New York.  Signed by US Magistrate Judge Bruce J. McGiverin on 1/9/2023. (bgl) (Entered: 01/09/2023) |

Approved: _____

**22 MAG 10337**

THOMAS S. BURNETT/NOAH SOLOWIEJCZYK
Assistant United States Attorneys

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :      **SEALED COMPLAINT**
                                    :
        - v. -                      :      Violation of 7 U.S.C.
                                    :      §§ 9(1), 13(a)(2),
AVRAHAM EISENBERG,                  :      13(a)(5); 17 C.F.R.
                                    :      § 180.1; 18 U.S.C. § 2
                                    :
                 Defendant.         :      COUNTY OF OFFENSE:
                                    :      New York
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRANDON RACZ, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

COUNT ONE
(Commodities Fraud)

        1.    In or about October 2022, in the Southern District
of New York and elsewhere, AVRAHAM EISENBERG, the defendant,
willfully and knowingly, directly and indirectly, used and
employed, and attempted to use and employ, in connection with a
swap, a contract of sale of a commodity in interstate and foreign
commerce, and for future delivery on and subject to the rules of
a registered entity, a manipulative and deceptive device and
contrivance, in contravention of Title 17, Code of Federal
Regulations, Section 180.1, by: (1) using and employing, and
attempting to use and employ, a manipulative device, scheme, and
artifice to defraud; (2) making, and attempting to make, untrue
and misleading statements of material fact and omitting to state
material facts necessary in order to make the statements made not
untrue or misleading; and (3) engaging, and attempting to engage
in acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon other persons, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on a cryptocurrency exchange called Mango Markets, and other manipulative and deceptive devices and contrivances.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

COUNT TWO<br>(Commodities Manipulation)

2.     In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, did knowingly and intentionally manipulate and attempt to manipulate the price of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, and of a swap, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on a cryptocurrency exchange called Mango Markets.

(Title 7, United States Code, Section 13(a)(2); Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3.     I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as a review of documents.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of this investigation.  Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview of the Mango Markets Manipulation Scheme

4.     As described in greater detail below, Mango Markets is a decentralized cryptocurrency exchange that has its own native crypto token, called MNGO.  Investors can buy and sell MNGO and other cryptocurrencies on Mango Markets.  Investors on Mango

2

Markets can also buy and sell perpetual futures ("Perpetuals") based on the relationship between the value of MNGO and the value of a crypto stablecoin called USD Coin ("USDC"), which is designed to be pegged to the dollar. Perpetuals are "swaps" under the Commodity Exchange Act. An investor who buys a Perpetual for MNGO stands to profit if the value of MNGO rises relative to the value of USDC, and an investor who sells a Perpetual for MNGO stands to profit if the value of MNGO falls relative to the value of USDC. Finally, Mango Markets allows investors to borrow cryptocurrency from the exchange, in amounts based on the value of the borrower's portfolio, and to withdraw that borrowed cryptocurrency.

5. As explained in greater detail below, in or about October 2022, AVRAHAM EISENBERG, the defendant, participated in a scheme to steal approximately $110 million by artificially manipulating the price of MNGO Perpetuals on Mango Markets (the "Market Manipulation Scheme"). The scheme worked as follows: EISENBERG used an account that he controlled on Mango Markets to sell a large amount of Perpetuals for MNGO and used a separate account on Mango Markets to purchase those same Perpetuals. In other words, EISENBERG sold himself MNGO Perpetuals. EISENBERG then engaged in a series of large purchases of MNGO, with the objective of artificially increasing the price of MNGO relative to USDC, which had the effect of increasing the price of MNGO Perpetuals on Mango Markets. That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to increase precipitously over the course of approximately 20 minutes. Over that time span of approximately 20 minutes, the price of MNGO Perpetuals rose from approximately 0.0382 USDC/MNGO to approximately 0.54 USDC/MANGO, an increase of approximately 1300 percent.

6. As the price of MNGO Perpetuals on Mango Markets rose as a result of the Market Manipulation Scheme perpetrated by AVRAHAM EISENBERG, the defendant, the value of the MNGO Perpetuals that EISENBERG had purchased also rose. Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the increase in the value of the MNGO Perpetuals EISENBERG had purchased allowed EISENBERG to borrow, then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange. When EISENBERG borrowed and withdrew that cryptocurrency, he had no intention to repay the borrowed funds. Accordingly, after EISENBERG borrowed and withdrew essentially all of the cryptocurrency deposits on the Mango Markets platform, EISENBERG ceased manipulating the price of MNGO Perpetuals, causing the price

3

of MNGO Perpetuals to fall significantly. Due to EISENBERG's withdrawals, other investors with deposits on Mango Markets lost much, or all, of those deposits.

<u>Background on Mango Markets</u>

7. Based on my training and experience, my participation in this investigation, my review of publicly available records (including the Mango Markets website), and my participation in discussions with individuals knowledgeable about Mango Markets, I have learned, in substance and in part, the following:

a. Mango Markets is a decentralized cryptocurrency exchange that allows investors to lend, borrow, swap, and leverage-trade cryptocurrency assets. Mango Markets is run by the Mango Decentralized Autonomous Organization (the "Mango DAO"). A decentralized autonomous organization, or "DAO," generally refers to an entity structure in which there is no central decision-making authority, and such authority is instead distributed across digital token holders, who cast votes to make decisions. In the context of the Mango DAO, for instance, holders of MNGO are allowed to vote on changes to Mango Markets and issues related to the governance of the Mango DAO, among other things.

b. To use Mango Markets, an investor must connect a cryptocurrency wallet to the exchange, create a Mango Markets account, and deposit cryptocurrency into that account. Once an investor has created and funded a Mango Markets account, the investor can trade different types of cryptocurrencies, including the MNGO token, on the Mango Markets exchange.

c. One type of trade investors can make is known as a "spot" trade. In a spot trade, an investor exchanges one cryptocurrency for another, at whatever the prevailing exchange rate between those two cryptocurrencies is at the time of the transaction. Investors can also make leveraged spot trades, in which the investor's deposits and other positions are used as collateral, allowing the investor to buy more of another cryptocurrency on margin than the investor could purchase through a one-for-one exchange.

d. Another type of trade available on Mango Markets is a perpetual futures contract, or "Perpetual" for short. When an investor buys or sells a Perpetual for a particular cryptocurrency, the investor is not buying or selling that cryptocurrency. Instead, the investor is buying or selling

exposure to future movements in the value of that cryptocurrency relative to another cryptocurrency. For example, if an investor buys a MNGO Perpetual at a price of 0.02 USDC/MNGO, the investor is "long" on MNGO, and the value of that perpetual will rise if the value of MNGO rise above 0.02 USDC/MNGO. Conversely, if an investor sells a MNGO Perpetual at a particular price, the investor is "short" on MNGO, and the value of that Perpetual will rise if the value of MNGO falls relative to USDC. Like with spot trading, investors on Mango Markets can also make leveraged Perpetuals trades, in which the investor's deposits and other positions act as collateral, thereby allowing the investor to buy a larger Perpetual position than the value of those deposits.

    e. For the reasons given above, the price of a Perpetual at any particular time depends on, among other things, the relative value of two cryptocurrencies. To determine the relative value of cryptocurrency pairs for purpose of pricing Perpetuals, Mango Markets uses an "oracle," which is a computer program that calculates the relative value of cryptocurrency pairings by looking at the exchange rate of those cryptocurrencies on various cryptocurrency exchanges (the "Oracle"). When the Oracle price changes for a particular cryptocurrency pairing, the price of Perpetuals in that cryptocurrency pairing also changes on Mango Markets. Accordingly, changes in the relative price of cryptocurrency pairs on other exchanges impact the price of Perpetuals on the Mango Markets platform.

    f. In addition to allowing investors to use deposits and other positions as collateral for leveraged trades, Mango Markets also allows investors to use those deposits and positions as collateral for borrowing and withdrawing cryptocurrency from the Mango Markets exchange. To borrow through Mango Markets, investors must access the Mango Markets website and click a button labeled "borrow" that allows the user to borrow cryptocurrency. The user can withdraw the cryptocurrency the user has borrowed by clicking another button labeled "withdraw." The cryptocurrency that investors borrow through Mango Markets comes from cryptocurrency that other investors have deposited in Mango Markets accounts.

    g. The amount that an investor on Mango Markets can withdraw is determined by a formula that looks at, among other things, the value of the cryptocurrency deposited in the investor's account, the value of the investor's positions on Mango Markets, and the amount of cryptocurrency that the investor has already borrowed through Mango Markets. Mango Markets uses a formula to track the relationship between these assets and liabilities, which

5

Mango Markets labels the "health" of the account. If the "health" of a Mango Markets account falls below zero, the investor's positions on Mango Markets can be liquidated.

8.     I understand that virtual currencies, such as USDC, are "commodities" under the Commodity Exchange Act ("CEA"). *See, e.g., C.F.T.C. v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ("A 'commodity' encompasses virtual currency both in economic function and in the language of the statute."); *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (finding "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition of commodities"). Accordingly, Perpetuals based on the relative value of MNGO and USDC are "swaps" under the CEA. *See* 7 U.S.C. § 1(47)(A).

<u>EISENBERG's Market Manipulation Scheme</u>

9.     Based on my review of records and data from a company called Circle, I have learned, in substance and in part, the following:

        a.     Circle provides a platform that allows individuals to create accounts, in which they can purchase, sell, store, and transfer the crypto stablecoin USDC.

        b.     In or about 2019, AVRAHAM EISENBERG, the defendant, opened an account at Circle ("Circle Account-1"). I know that EISENBERG is the user of Subject Account-1 because the account opener used the name "Avraham Eisenberg" and provided a photograph of EISENBERG's passport. I have reviewed that photograph and recognize the person pictured on the passport as EISENBERG.

10.    Based on my review of publicly available trading data, data from a cryptocurrency exchange ("Exchange-1"), and data from Circle, I have learned that, on or about October 11, 2022, AVRAHAM EISENBERG, the defendant, created a large Perpetual position based on the relative value of MNGO and USDC by funding two Mango Markets accounts and selling a large amount of Perpetuals from one to the others. Specifically, I have learned, in substance and in part, the following:

a. On or about October 11, 2022, in the late morning and early afternoon,[1] Circle Account-1, which belongs to EISENBERG, sent approximately 14,179,322 USDC to a cryptocurrency wallet that then sent approximately 12,499,900 USDC to an account at Exchange-1 (the "Exchange-1 Account") which as explained below, is also controlled by EISENBERG.

b. Between approximately 3:36 p.m. and 3:50 p.m., Exchange-1 Account sent approximately 5,524,838 USDC to a cryptocurrency wallet ("Solana Wallet-1") on the blockchain known as Solana, which is the blockchain on which Mango Markets is built.

c. At approximately 3:47 p.m., the Exchange-1 Account sent approximately 4,999,999.95 USDC to another wallet on the Solana blockchain ("Solana Wallet-2").

d. Between approximately 6:08 p.m. and 6:18 p.m., the Exchange-1 Account sent approximately 5,000,100 USDC to a Mango Markets account ("Mango Account-1").

e. Between approximately 6:07 p.m. and 6:18 p.m., Solana Wallet-2 sent approximately 4,999,998.95 USDC to a different Mango Markets account ("Mango Account-2").

f. Between approximately 6:24 p.m. and 6:25 p.m., Mango Account-2 sold to Mango Account-1 Perpetuals based on the relative value of MNGO and USDC. The Perpetuals were based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO. Accordingly, Mango Account-1 held a "long" position, the value of which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO (the "Long MNGO Perpetual Position"). Mango Account-2 held a "short" position, the value of which would rise if the value of MNGO relative to USDC fell below 0.0382 USDC/MNGO (the "Short MNGO Perpetual Position").

g. Because the USDC that funded both Mango Account-1 and Mango Account-2 originated with EISENBERG's account at Circle, it appears that EISENBERG controlled or at a minimum funded both Mango Account-1 and Mango Account-2. Accordingly, EISENBERG was on both sides of the MNGO Perpetual transaction described above.

---

[1] All times are in Eastern Time and, based on my review of travel records, I have learned that EISENBERG was in Puerto Rico at the time of the Market Manipulation Scheme.

11. As described in the following paragraphs, immediately after the creation of the Long and Short MNGO Perpetuals, AVRAHAM EISENBERG, the defendant, used USDC to purchase large amounts of MNGO on multiple cryptocurrency exchanges, which had the effect of artificially increasing the value of MNGO relative to USDC.

12. Based on my review of publicly available trading data on the Solana blockchain and my review of publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

a. Aggregator-1 is a program that allows users to buy and sell cryptocurrency across a number of different cryptocurrency exchanges simultaneously. Aggregator-1 is available through the Mango Markets, as another way for Mango Markets investors to buy and sell cryptocurrency. One of the cryptocurrency exchanges through which Aggregator-1 transacts is one of the programs from which the Oracle gathered data for pricing Perpetuals.

b. As explained above, on or about October 11, 2022, Circle Account-1, which was the account belonging to AVRAHAM EISENBERG, the defendant, at Circle, sent USDC to the Exchange-1 Account, which then sent USDC to Solana Wallet-1.

c. Between approximately 6:26 p.m. and approximately 6:45 p.m., on or about October 11, 2022, the user of Solana Wallet-1 executed multiple transactions on Jupiter Aggregator, in which the user of Solana Wallet-1 sold USDC for a total of over 3.4 million MNGO.

d. At the same time as the user of Solana Wallet-1 was purchasing a large volume of MNGO through Aggregator-1, the value of MNGO relative to USDC rose from a low of approximately 0.0389 USDC/MNGO to a high of approximately 0.91 USDC/MNGO on the exchange utilized by the Oracle for pricing Perpetuals.

13. Based on my review of data and records from a cryptocurrency exchange that has offices in, among other locations, Manhattan, New York ("Exchange-2"), communications with representatives of Exchange-2, and publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

a. Exchange-2 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

b.  On or about October 11, 2022, an individual opened and funded an anonymous account on Exchange-2 (the "Exchange-2 Account").

c.  Between approximately 6:26 p.m. and approximately 6:45 p.m., the Exchange-2 Account sold USDT for over 1 million MNGO.  During that period, the price of MNGO rose from a low of approximately 0.04 USDT/MNGO to a high of approximately 0.45 USDT/MNGO.  Like USDC, USDT is a stablecoin designed to be pegged to the dollar.

d.  I have learned that AVRAHAM EISENBERG, the defendant, controlled the Exchange-2 Account.  Specifically, I have learned, in substance and in part, that following the Market Manipulation Scheme, Exchange-2 froze funds in the Exchange-2 Account, and EISENBERG initiated a legal action to try to retrieve the funds from the account, claiming to be the owner.

e.  Opening, funding, and trading through Exchange Account-2 resulted in wires and data being transmitted to, among other locations, Exchange-2's office in Manhattan.

14.  Based on my review of data and records from Exchange-1, records from Google, and publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

a.  Exchange-1 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

b.  As explained above, Circle Account-1, which belongs to AVRAHAM EISENBERG, the defendant, sent USDC to the Exchange-1 Account on or about October 11, 2022.

c.  The Exchange-1 Account was opened on or about September 19, 2022, using a passport and personal identifying information that appears to belong to a Ukrainian woman, along with a particular Gmail address ("Gmail Address-1").

d.  Nonetheless, it appears that the Exchange-1 Account is controlled by EISENBERG for the following reasons, among others:

i.  As explained above, EISENBERG's Circle Account, Circle Account-1, sent over 12 million USDC to the Exchange-1 Account.

9

       ii.   Gmail Address-1, which was used to create the Exchane-1 Account, was created on or about September 1, 2022 — just a few weeks before the Exchange-1 Account was opened. The recovery email address for Gmail Address-1 is "avi@thimessolutions.com," which is registered to EISENBERG. Similarly, the recovery phone number for Gmail Address-1 is the same phone number that EISENBERG listed as his contact phone number for Circle Account-1. Accordingly, it appears that EISENBERG actually controls Gmail Address-1, which was then used to create the Exchange-1 Account.

       e.   Between approximately 6:26 p.m. and 6:40 p.m., the Exchange-1 Account sold USDC for a total of over 16 million MNGO. During that period, the price of MNGO rose from a low of approximately 0.0388 USDC/MNGO to a high of approximately 0.1557 USDC/MNGO.

       15.  By artificially manipulating the value of MNGO relative to USDC, AVRAHAM EISENBERG, the defendant, also intended to and did increase the price of MNGO Perpetuals on Mango Markets, which significantly increased the value of the Long MNGO Perpetual Position that EISENBERG had purchased, thereby allowing EISENBERG to borrow and withdraw large amounts of cryptocurrency from Mango Markets. Specifically, based on my review of publicly available data from Mango Markets, I have learned, in substance and in part, the following:

       a.   As explained above, the price of Perpetuals on Mango Markets was set by the Oracle, which calculates the relative price of cryptocurrencies by looking at prices on other cryptocurrency exchanges.

       b.   During the trading described above, the price of Perpetuals based on the relative value of MNGO and USDC on Mango Markets rose significantly. Specifically, between approximately 6:26 p.m. and 6:45 p.m., on or about October 11, 2022, the price of MNGO Perpetuals on Mango Markets rose from approximately 0.0382 USDC/MNGO to a high of approximately 0.54 USDC/MNGO — an increase of over 1300 percent.

       c.   As the price of MNGO Perpetuals rose, the value of the Long MNGO Perpetual Position that Mango Account-1 had purchased rose, accordingly. Because of that increase in value, EISENBERG, who controlled Mango Account-1, was able to use the "borrow" and "withdraw" function on Mango Markets to borrow and

withdraw a large amount of cryptocurrency, without the "health" of Mango Account-1 dropping low enough to trigger liquidation.

   d. Following that increase in borrowing power, EISENBERG borrowed and withdrew approximately $110 million worth of different cryptocurrencies from Mango Markets.  For example:

    i. At approximately 6:29 p.m., Mango Account-1 borrowed and withdrew approximately 50,000,000 USDC from Mango Markets and sent those assets to Solana Wallet-1.

    ii. At approximately 6:36 p.m., Mango Account-1 borrowed and withdrew approximately 400,000 SOL, which is the Solana cryptocurrency, from Mango Markets, and sent those assets to Solana Wallet-1.

    iii. At approximately 6:37 p.m., Mango Account-1 borrowed and withdrew approximately 798,000 mSOL, which is a crypto token on the Solana blockchain, and approximately 282.12 wBTC, which is a cryptocurrency designed to track the value of Bitcoin, from Mango Markets.

    iv. At approximately 6:41 p.m., Mango Account-1 borrowed and withdrew approximately 2,807,721 USDC and approximately 3,266,426 USDT, which is a cryptocurrency designed to track the value of the dollar, from Mango Markets, and sent those assets to Solana Wallet-1.

    v. At approximately 6:45 p.m., Mango Account-1 borrowed and withdrew approximately 2,354,260 SRM, which is the native cryptocurrency for a platform called Serum, and approximately 32,409,565.06 MNGO, from Mango Markets, and sent those assets to Solana Wallet-1.

   e. The cryptocurrency that EISENBERG borrowed and withdrew came from, among other places, the deposits and assets belonging to other Mango Markets investors.  The user of Mango Account-1 withdrew effectively all available funds from Mango Markets.

   f. While EISENBERG purported to be borrowing the cryptocurrency, he appeared to have no intention of actually repaying those loans.  Following the withdrawals described above, Solana Wallet-1, the Exchange-1 Account, and the Exchange-2 Account ceased purchasing MNGO and began to sell MNGO for USDC. The price of MNGO tokens fell precipitously, causing the price of MNGO Perpetuals on Mango Markets to fall to approximately 0.02

11

USDC/MNGO. As a result, the Long MNGO Perpetual Position dropped to having a negative value and the "health" of Mango Account-1 fell below zero, making Mango Account-1 subject to liquidation. There was, however, nothing to liquidate because EISENBERG had already withdrawn the cryptocurrency.

<u>EISENBERG Admits to the Market Manipulation Scheme</u>

16. Based on my review of publicly available posts on a website where holders of MNGO can vote on Mango DAO proposals, as well as my communications with individuals who have knowledge of Mango DAO's operations, I have learned, in substance and in part, the following:

a. Between on or about October 11 and 13, 2022, representatives of Mango DAO engaged in negotiations with an individual purporting to be the perpetrator and others purporting to be in contact with the perpetrator. The negotiations focused on, among other things, the perpetrator returning some of the cryptocurrency from the attack.

b. Based on those negotiations, on or about October 13, 2022, members of the Mango DAO issued a written proposal on the Mango DAO message board and to the user of Solana Wallet-1. The proposal had, among other things, the following terms: (i) the Mango DAO would receive cryptocurrency worth approximately $67 million from the user of Solana Wallet-1; (ii) the funds from the user of Solana Wallet-1 would, in combination with funds owned by the Mango DAO, be used to, among other things, repay Mango Market investors who had lost deposits; (iii) holders of MNGO would agree to waive certain civil claims and refrain from pursuing criminal investigations or attempting to freeze assets taken during the scheme. The proposal also called for the user of Solana Wallet-1 to make a 10,000,000 USDC payment to a wallet controlled by members of the Mango DAO, no later than 12 hours after the issuance of the proposal, and before a final vote.

c. On or about October 15, 2022, a cryptocurrency wallet on the Ethereum blockchain ("Ethereum Wallet-1") sent approximately 10 million USDC to a wallet controlled by members of the Mango DAO. Based on the proposal described above, it therefore appears that the user of Solana Wallet-1 also controls Ethereum Wallet-1.

d. After the transfer described, members of the Mango DAO voted to approve the October 13, 2022 proposal described

above.  Following that approval, multiple cryptocurrency wallets sent the Mango DAO approximately $57 million worth of cryptocurrency, in addition to the 10 million USDC that Mango DAO had already received.

       e.   Members of Mango DAO and Mango Markets did not receive the rest of the cryptocurrency that had been taken, which amounted to approximately $40 million worth of different cryptocurrencies.

       17.  Shortly after the negotiations described above, AVRAHAM EISENBERG, the defendant, claimed responsibility for the Market Manipulation Scheme.  Specifically, based on my review of publicly available information on Twitter, I have learned, in substance and in part, the following:

       a.   EISENBERG uses a particular Twitter account ("Twitter Account-1").  EISENBERG appears to be the user of Twitter Account-1 because the username of the account is "Avraham Eisenberg" and, in the past, Twitter Account-1 displayed a user photograph that I know was an image of EISENBERG based on my review of his passport photograph.

       b.   On or about October 15, 2022 — the same day as the repayment of some cryptocurrency as described above — Twitter Account-1 displayed a series of posts stating, in substance and in part, that the user of Twitter Account-1 had "operated a highly profitable trading strategy" that "took place on[] Mango Markets" and resulted in Mango Markets becoming "insolvent."[2]

       c.   Moreover, EISENBERG's posts on Twitter Account-1 show that he was aware of the laws prohibiting market manipulation.  For example, on or about September 1, 2022, Twitter Account-1 posted a link to a press release from the United States Attorney's Office of the Southern District of New York, announcing charges, including under the CEA, in connection with a defendant artificially manipulating a foreign currency exchange rate in order to trigger a payment under an options contract.

       18.  Based on my review of travel records, I have learned that, on or about October 12, 2022 – the day after the Market Manipulation Scheme – AVRAHAM EISENBERG, the defendant, flew from

---

[2] The posts also stated, in substance and in part, that the user of Twitter Account-1 had helped negotiate an agreement to make users of Mango Markets whole and that the user of Twitter Account-1 believed all of his actions were legal.

the United States to Israel. Based on the timing of the flight, the travel appears to have been an effort to avoid apprehension by law enforcement in the immediate aftermath of the Market Manipulation Scheme.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of AVRAHAM EISENBERG, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.


/s/ Brandon Racz (sworn telephonically)
BRANDON RACZ
Special Agent
FBI

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 4.1 and 41(d)(3), this
23rd th day of December, 2022

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno:  Thomas S. Burnett, (646) 565-1633

# UNITED STATES DISTRICT COURT

for the

## Southern District of New York

United States of America )
v. )
Avraham Eisenberg )
)
)
)
)

_Defendant_

# 22 MAG 10337

Case No.

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_    Avraham Eisenberg                                   ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment    ❏ Superseding Indictment    ❏ Information    ❏ Superseding Information    ☑ Complaint
❏ Probation Violation Petition    ❏ Supervised Release Violation Petition    ❏ Violation Notice    ❏ Order of the Court

This offense is briefly described as follows:

Violations of 7 U.S.C. §§ 9(1), 13(a)(2), 13(a)(5); 17 C.F.R. § 180.1; and 18 U.S.C. § 2

Date:    12/23/2022

_Issuing officer's signature_

City and state:   New York, NY

Hon. Gabriel W. Gorenstein, USMJ
_Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ at _(city and state)_ _____ . |
| Date: _____ |
| _Arresting officer's signature_ |
| _Printed name and title_ |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
     Plaintiff,

        v.

Avraham Meyer Eisenberg,
     Defendant.

CRIMINAL NO.

## NOTICE OF APPEARANCE

TO THE CLERK OF THE COURT AND ALL PARTIES OF RECORD:

1.     Enter the appearance of the undersigned Assistant Federal Public Defender (AFPD) as counsel for Avraham Meyer Eisenberg.

2.     Pursuant to policy of the Federal Public Defender for the District of Puerto Rico, notice of filings, both electronic and otherwise, are requested to be made jointly to the AFPD assigned to the case and to the Federal Public Defender, Mr. Eric A. Vos.

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 28th day of December, 2022.

**ERIC A. VOS**
**Federal Public Defender**
**District of Puerto Rico**

*S / Joseph Adam Niskar*
USDC-PR 03007
241 F.D. Roosevelt Ave.
San Juan, PR 00918-2441
Email: Joseph_Niskar@fd.org

AO 470 (Rev. 01/09) Order Scheduling a Detention Hearing

# UNITED STATES DISTRICT COURT
for the
District of Puerto Rico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 22-1583 (M) |
| Avraham Mayer Eisenberg (1) | ) | |
| | ) | |
| *Defendant* | ) | |

## ORDER SCHEDULING A DETENTION HEARING

A detention hearing in this case is scheduled as follows:

| Place: | U.S. District Court<br>Federal Building, 4th Floor<br>150 Chardon Ave.<br>Hato Rey, P.R. 00917 | Courtroom No.: Courtroom 9 |
|---|---|---|
| | | Date and Time: 12/30/2022 at 10:30 AM |

**IT IS ORDERED:** Pending the hearing, the defendant is to be detained in the custody of the United States marshal or any other authorized officer. The custodian must bring the defendant to the hearing at the time, date, and place set forth above.

Date: _____12/27/2022_____

S/BRUCE J. McGIVERIN

*Judge's signature*

Bruce J. McGiverin, US Magistrate Judge

*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. NO.: 22-1583 (M) |
| **Plaintiff** | |
| **v.** | |
| AVRAHAM MEYER EISENBERG | |
| **Defendant** | |

**NOTICE OF APPEARANCE**

**TO THE HONORABLE COURT:**

**COMES NOW** the undersigned attorney and very respectfully gives notice of his appearance in the captioned case on behalf of defendant Avraham Meyer Eisenberg.

**WHEREFORE**, the undersigned very respectfully requests that this Honorable Court take note of the above and that all Orders, Motions or other documents filed in the above captioned proceeding be notified to the undersigned.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico this 29th day of December, 2022.

**I HEREBY CERTIFY** that on December 29, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsels of record.

S/Manuel San Juan
MANUEL SAN JUAN
USDC-PR No.: 204706
P.O. Box 9023587
San Juan, Puerto Rico 00902-3587
Tel.: (787) 723-6637 / (787) 723-6669
Fax: (787) 725-2932
E-mail: sanjuanm@microjuris.com

AO 472 (Rev. 11/16) Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT
for the

District of Puerto Rico

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | )   Case No.  22-1583 (M) |
| Avraham Mayer Eisenberg | ) |
| *Defendant* | ) |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☐ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

☒ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted.  This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☐ **(e)** any felony that is not otherwise a crime of violence but involves:
**(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; *and*

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; *and*

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; *and*

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

Page 1 of 3

☐ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

    ☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

    ☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

    ☐ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

    ☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

    ☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☐ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

    ☐ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

    **OR**

    ☐ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

☐ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☒ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

    ☐ Weight of evidence against the defendant is strong
    ☒ Subject to lengthy period of incarceration if convicted
    ☐ Prior criminal history
    ☐ Participation in criminal activity while on probation, parole, or supervision
    ☐ History of violence or use of weapons
    ☐ History of alcohol or substance abuse
    ☐ Lack of stable employment
    ☐ Lack of stable residence
    ☐ Lack of financially responsible sureties
    ☐ Lack of significant community or family ties to this district

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

- ☒ Significant family or other ties outside the United States
- ☐ Lack of legal status in the United States
- ☐ Subject to removal or deportation after serving any period of incarceration
- ☐ Prior failure to appear in court as ordered
- ☐ Prior attempt(s) to evade law enforcement
- ☐ Use of alias(es) or false documents
- ☒ Background information unknown or unverified
- ☐ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:

- Nature of the charged offenses.
- Government proffers the defendant left the United States for two months after committing the offense.
- The charged offense involves alleged appropriation of tens of millions of dollars of crypto currency, of which up to $40 million remain unaccounted for, giving the defendant, when combined with his duo citizenship and ties to a foreign country, the means and motivation to flee.

THE ORDER IS WITHOUT PREJUDICE TO ANY REVISION BY THE COURT IN THE PROSECUTING DISTRICT.

### Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____01/04/2023_____          _____s/ Bruce J. McGiverin_____
                                                         United States Magistrate Judge

| AO 435 (Rev. 04/18) | ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS | FOR COURT USE ONLY |
| | **TRANSCRIPT ORDER** | DUE DATE: |
| Please Read Instructions: | | |

| 1. NAME Manuel San Juan | 2. PHONE NUMBER (787) 723-6637 | 3. DATE 1/5/2022 |
|---|---|---|

| 4. DELIVERY ADDRESS OR EMAIL (sanjuanm@microjuris.com) or 206 Tetuán St. Suite 902 | 5. CITY Old San Juan | 6. STATE PR | 7. ZIP CODE 00901 |
|---|---|---|---|

| 8. CASE NUMBER 3:22-mj-01583-BJM | 9. JUDGE Bruce J. McGiverin | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 12/30/2022 | 11. TO 12/30/2022 |

| 12. CASE NAME USA v. Avraham Mayer Eisenberg | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 13. CITY San Juan | 14. STATE Puerto Rico |

**15. ORDER FOR**

| | | |
|---|---|---|
| ☐ APPEAL | ☒ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☐ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spey) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☒ BAIL HEARING | 12/30/2022 | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☒ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | ☐ | ☐ | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE *Manuel San Juan* | PROCESSED BY | |
|---|---|---|
| 19. DATE 1/5/2023 | PHONE NUMBER (787) 723-6637 | |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS | |

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| DEPOSIT PAID | DEPOSIT PAID | |
|---|---|---|
| TRANSCRIPT ORDERED | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | TOTAL DUE | 0.00 |

DISTRIBUTION:     COURT COPY     TRANSCRIPTION COPY     ORDER RECEIPT     ORDER COPY

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                     :

UNITED STATES OF AMERICA     :    **INDICTMENT**

       - v. -         :    23 Cr.

AVRAHAM EISENBERG,       :

       Defendant.    :

- - - - - - - - - - - - - - - x

**23 CRIM 010**

## COUNT ONE
(Commodities Fraud)

The Grand Jury charges:

### Overview

1.   In or about October 2022, AVRAHAM EISENBERG, the defendant, orchestrated and carried out a scheme to fraudulently obtain approximately $110 million worth of cryptocurrency from a cryptocurrency exchange called Mango Markets and its investors.

2.   At all relevant times, Mango Markets allowed investors to buy and sell perpetual futures contracts ("Perpetuals"). That included Perpetuals based on the relative value of Mango Markets' native crypto token, MNGO, and a crypto stablecoin called USDC ("MNGO Perpetuals"). An investor who buys MNGO Perpetuals stands to profit if the value of MNGO rises relative to the value of USDC, while an investor who sells MNGO Perpetuals stands to profit if the value of MNGO falls relative to USDC.

3.   On or about October 11, 2022, AVRAHAM EISENBERG, the defendant, deceptively used two accounts on Mango Markets that did not appear to the public to both be controlled by him, but were in fact controlled by him, to sell himself, from himself, a large number of MNGO Perpetuals.  EISENBERG then made a series of large purchases of MNGO using USDC, with the objective of artificially increasing the price of MNGO relative to USDC and, in turn, the price of MNGO Perpetuals on Mango Markets.  That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to rise approximately 1300 percent.

4.   As the price of MNGO Perpetuals on Mango Markets rose due to the manipulative purchasing by AVRAHAM EISENBERG, the defendant, the apparent value of the MNGO Perpetuals that EISENBERG had purchased from himself also rose.  Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the artificial increase in the value of the MNGO Perpetuals EISENBERG had purchased from himself allowed him to borrow, and then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange.

5.   When AVRAHAM EISENBERG, the defendant, borrowed and withdrew that cryptocurrency, he had no intention of repaying the

2

borrowed funds but rather to steal those funds.

### Background on Mango Markets

6. At all times relevant to this Indictment, Mango Markets was a decentralized cryptocurrency exchange that allowed investors to, among other things, purchase and borrow cryptocurrencies and cryptocurrency-related financial products. Mango Markets was run by the Mango Decentralized Autonomous Organization (the "Mango DAO").

7. The Mango DAO had its own crypto token, called MNGO, which investors could buy and sell. Holders of MNGO were allowed to vote on changes to Mango Markets and issues related to the governance of the Mango DAO, among other things.

8. To use Mango Markets, an investor had to connect a cryptocurrency wallet to the exchange, create a Mango Markets account, and deposit cryptocurrency into that account. Once an investor created and funded a Mango Markets account, the investor could trade different types of cryptocurrencies, including MNGO, on the Mango Markets exchange.

9. One type of trade investors could make is a "spot" trade. In a spot trade, an investor exchanges one cryptocurrency for another, at whatever the prevailing exchange rate between those two cryptocurrencies is at the time of the transaction.

10. Another type of trade investors on Mango Markets

3

could make was a perpetual futures contract, or "Perpetual" for short. When an investor buys or sells a Perpetual for a particular cryptocurrency, the investor is not buying or selling that cryptocurrency. Instead, the investor is buying or selling exposure to future movements in the value of that cryptocurrency relative to another cryptocurrency. For example, an investor who buys a Perpetual based on the relative value of USDC and MNGO (a "MNGO Perpetual," for short) at a price of 0.02 USDC/MNGO is "long" on MNGO, and the value of that position will rise if the value of MNGO rise above 0.02 USDC/MNGO. Conversely, the investor who sold that Perpetual is "short" on MNGO, and the value of that position will rise if the value of MNGO falls relative to USDC. Either party to a Perpetual can settle the Perpetual at any time and realize their gain or loss.

11. To determine the settlement price of Perpetuals, Mango Markets uses an "oracle," which is a computer program that calculates the relative value of two cryptocurrencies by looking at the exchange rate of those cryptocurrencies on various cryptocurrency exchanges (the "Oracle"). When the Oracle price changes for a particular cryptocurrency pairing, the settlement price of Perpetuals based on that cryptocurrency pairing also changes on Mango Markets.

12. Each party to a Perpetual on Mango Markets also

4

regularly makes or receives payments known as "funding" payments. Funding payments are calculated based on the midprice of bids and asks for that Perpetual compared to the Oracle price for that Perpetual. Funding payments are designed to ensure the purchase price for Perpetuals stays close to settlement prices.

13. In addition to buying and selling cryptocurrencies and Perpetuals, Mango Markets also allowed investors to use their deposits and positions as collateral for borrowing and withdrawing cryptocurrency from the Mango Markets exchange. To borrow through Mango Markets, an investor had to access the Mango Markets website and click a button labeled "borrow" that allowed the investor to borrow cryptocurrency. The investor could then withdraw the borrowed cryptocurrency by clicking another button labeled "withdraw." The borrowed cryptocurrency came from cryptocurrency that other investors had deposited in Mango Markets accounts.

14. The amount that an investor on Mango Markets could withdraw was determined by a formula that looks at, among other things, the value of the cryptocurrency deposited in the investor's account, the value of the investor's positions on Mango Markets, and the amount of cryptocurrency that the investor had already borrowed through Mango Markets. Mango Markets used a formula to track the relationship between these assets and liabilities, which Mango Markets labeled the "health" of the account. If the "health"

5

of a Mango Markets account fell below a certain threshold, the investor's positions on Mango Markets could be liquidated.

### AVRHAM EISENBERG's Market Manipulation Scheme

15. On or about October 11, 2022, AVRAHAM EISENBERG, the defendant, transferred millions of USDC to two accounts on Mango Markets. Specifically:

a. EISENBERG had a cryptocurrency account with a company called Circle ("Circle Account-1").

b. On or about October 11, 2022, in the late morning and early afternoon, EISENBERG sent approximately 14,179,322 USDC from Circle Account-1 to a cryptocurrency wallet that then sent approximately 12,499,900 USDC to another account at a cryptocurrency exchange (the "Exchange-1 Account" and "Exchange-1," respectively). EISENBERG controlled the Exchange-1 Account, but it was registered in the name of a different person with a foreign address.

c. Between approximately 3:36 p.m. and 3:50 p.m.[1], EISENBERG used the Exchange-1 Account to send approximately 5,524,838 USDC to a cryptocurrency wallet ("Solana Wallet-1") on the blockchain known as Solana, which is the blockchain on which Mango Markets is built.

d. At approximately 3:47 p.m., EISENBERG used the

---

[1] All times in this Indictment are in Eastern Standard Time.

Exchange-1 Account to send approximately 4,999,999.95 USDC to another wallet on the Solana blockchain ("Solana Wallet-2").

        e.   Between approximately 6:08 p.m. and 6:18 p.m., Solana Wallet-1 sent approximately 5,000,100 USDC to a Mango Markets account ("Mango Account-1").

        f.   Between approximately 6:07 p.m. and 6:18 p.m., Solana Wallet-2 sent approximately 4,999,998.95 USDC to a different Mango Markets account ("Mango Account-2").

        16.   AVRAHAM EISENBERG, the defendant, used Mango Account-2 to sell MNGO Perpetuals to Mango Account-1. The Perpetuals were based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO. Accordingly, Mango Account-1 held a "long" position, the value of which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO (the "Long MNGO Perpetual Position"). Mango Account-2 held a "short" position, the value of which would rise if the value of MNGO relative to USDC fell below 0.0382 USDC/MNGO (the "Short MNGO Perpetual Position"). EISENBERG, however, was the owner of both positions.

        17.   Immediately after the creation of the Long and Short MNGO Perpetual Positions, AVRAHAM EISENBERG, the defendant, used USDC and another stablecoin called USDT to purchase large amounts of MNGO on multiple cryptocurrency exchanges with the objective of artificially increasing the value of MNGO relative to

7

USDC on the exchange on which EISENBERG traded. EISENBERG's purchases had their intended effect and caused the value of MNGO to increase relative to USDC. Specifically:

a. Exchange-1 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

b. Between approximately 6:26 p.m. and 6:40 p.m., EISENBERG used the Exchange-1 Account – which, as explained above, was registered to a different person – to sell USDC for a total of over 16 million MNGO. During that period, the price of MNGO on Exchange-1 rose from a low of approximately 0.0388 USDC/MNGO to a high of approximately 0.1557 USDC/MNGO.

c. Aggregator-1 is a program that allows users to buy and sell cryptocurrency across a number of different cryptocurrency exchanges simultaneously. Aggregator-1 is available through the Mango Markets, as another way for Mango Markets investors to buy and sell cryptocurrency. One of the cryptocurrency exchanges through which Aggregator-1 transacts is one of the programs from which the Oracle gathered data for pricing Perpetuals.

d. Between approximately 6:26 p.m. and approximately 6:45 p.m., on or about October 11, 2022, EISENBERG executed multiple transactions on Aggregator-1, in which he sold USDC for a total of over 3.4 million MNGO. At the same time as

8

EISENBERG made those purchases, the value of MNGO relative to USDC rose from a low of approximately 0.0389 USDC/MNGO to a high of approximately 0.91 USDC/MNGO on the exchange utilized by the Oracle for pricing Perpetuals.

e. A cryptocurrency exchange with offices in New York, New York ("Exchange-2"), is another one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

f. On or about October 11, 2022, EISENBERG opened and funded an anonymous account on Exchange-2 (the "Exchange-2 Account"), providing false information about his location to circumvent Exchange-2's restrictions on traders from the United States. Opening, funding, and trading through Exchange Account-2 resulted in wires and data being transmitted to, among other locations, Exchange-2's office in Manhattan.

g. Between approximately 6:26 p.m. and approximately 6:45 p.m., EISENBERG used the Exchange-2 Account to sell USDT for over 1 million MNGO. During that period, the price of MNGO on Exchange-2 rose from a low of approximately 0.04 USDT/MNGO to a high of approximately 0.45 USDT/MNGO.

18. By artificially manipulating the value of MNGO relative to USDC, AVRAHAM EISENBERG, the defendant, also intended to and did artificially increase the price of MNGO Perpetuals on Mango Markets. Specifically, between approximately 6:26 p.m. and

9

6:45 p.m., on or about October 11, 2022, the price of MNGO Perpetuals on Mango Markets rose from approximately 0.0382 USDC/MNGO to a high of approximately 0.54 USDC/MNGO — an increase of over 1300 percent.

19. As the price of those Perpetuals rose as a result of the above-described manipulative trading by AVRAHAM EISENBERG, the defendant, the apparent value of the Long MNGO Perpetual Position that Mango Account-1 had purchased rose, accordingly. Because of that increase in apparent value, EISENBERG, who controlled Mango Account-1, was able to use the "borrow" and "withdraw" function on Mango Markets to borrow and withdraw a large amount of cryptocurrency, without the "health" of Mango Account-1 dropping low enough to trigger liquidation.

20. Following that increase in borrowing power, AVRAHAM EISENBERG, the defendant, borrowed and withdrew approximately $110 million worth of different cryptocurrencies from Mango Markets. The cryptocurrency that EISENBERG borrowed and withdrew came from, among other places, the deposits and assets belonging to other Mango Markets investors. As a result of these actions, EISENBERG withdrew nearly all then-available funds from Mango Markets.

21. While AVRAHAM EISENBERG, the defendant, purported to be borrowing the cryptocurrency, he had no intention of repaying.

10

36

22.  After AVRAHAM EISENBERG, the defendant, stopped purchasing MNGO with USDC, the price of MNGO Perpetuals on Mango Markets — which was no longer being artificially propped up by EISENBERG — collapsed to approximately 0.02 USDC/MNGO.  As a result, the Long MNGO Perpetual Position dropped to having a negative value and the "health" of Mango Account-1 fell below zero, making Mango Account-1 subject to liquidation.  There was, however, nothing to liquidate because EISENBERG had already withdrawn the cryptocurrency and the Long MNGO Perpetual had been revealed to be worthless.

<u>Statutory Allegations</u>

23.  In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of material fact and omitting to state a material fact

11

necessary in order to make the statements made not untrue or misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, EISENBERG engaged in a manipulative and deceptive scheme involving the intentional and artificial manipulation of the relative value of USDC and MNGO and the price of perpetual futures contracts on Mango Markets; trading with himself to create artificial perpetual futures contracts positions on Mango Markets; misrepresenting his intentions to borrow cryptocurrency from Mango Markets; and using false personal identifying and location information in furtherance of his scheme.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

### Count Two
(Commodities Manipulation)

The Grand further Jury charges:

24.  The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

25.  In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, did knowingly and intentionally manipulated and attempted to manipulate the price of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered

12

entity, and of a swap, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on Mango Markets.

(Title 7, United States Code, Section 13(a)(2); Title 18, United States Code, Section 2.)

### Count Three
(Wire Fraud)

The Grand further Jury charges:

26. The allegations contained in paragraphs 1 through 22 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

27. In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, EISENBERG engaged in a manipulative and deceptive scheme involving the intentional and artificial manipulation of the relative value of USDC and MNGO and the price of perpetual futures contracts on Mango Markets; trading with himself to create artificial perpetual futures contracts

13

positions on Mango Markets; misrepresenting his intentions to borrow cryptocurrency from Mango Markets; and using false personal identifying and location information in furtherance of his scheme, and sent and caused to be sent wires in furtherance of the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

28.  As a result of committing the offense alleged in Count Three of this Indictment, AVRAHAM EISENBERG, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## SUBSTITUTE ASSET PROVISION

29.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third person;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

14

      e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p) and Title 28, United States Code,

Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

     (Title 18, United States Code, Sections 981 and 982;
        Title 21, United States Code, Section 853; and
         Title 28, United States Code, Section 2461.)

_____
Foreperson
1/9/23

_____
DAMIAN WILLIAMS
United States Attorney

15

41

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

### - v. -

### AVRAHAM EISENBERG,

### Defendant.

---

### <u>INDICTMENT</u>

23 Cr.

(7 U.S.C. §§ 9(1), 13(a)(2), 13(a)(5); 17
C.F.R. § 180.1; 18 U.S.C. §§ 1343 and 2.)

---

DAMIAN WILLIAMS
United States Attorney.

---

1-9-2023

TRUE BILL & INDICTMENT

MJ. RWL

Wheel to DJ — BERMAN

AO 94  (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

District of Puerto Rico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Avraham Mayer Eisenberg (1) | ) | Case No.   3:22-mj-01583-BJM-1 |
| | ) | |
| | ) | Charging District's |
| Defendant | ) | Case No.   1:23-cr-00010-RMB |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____ Southern _____ District of _____ New York _____ ,

*(if applicable)* _____ division.  The defendant may need an interpreter for this language:

_____ .

The defendant:    ☑ will retain an attorney.

☐ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant.  The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled.  The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date:  _____ 01/09/2023 _____          _____ S/ BRUCE J. McGIVERIN _____

*Judge's signature*

_____ Bruce J. McGiverin, U.S. Magistrate Judge _____

*Printed name and title*